**Jerry GUMPERT and Martin Coyne, Appellants,**

v.

**ABF FREIGHT SYSTEM, INC., Barry Sircy, Tommy Walker, Robert Graves, George Warren, Perry Wayne Middlebrook, Richard Crawford, Richard Fiser, Daniel Noonkester, Richard Martinez, Richard Passmore, and Leonard Esner, Jr., Appellees.**

No. 05–07–01717–CV.

Court of Appeals of Texas, Dallas.

May 20, 2009.

Rehearing Overruled Aug. 20, 2009.

Carl David Adams, The Law Offices of Carl David Adams, Robert E. Goodman, Jr., Dallas, TX, for appellant.

Michael Andrew McCabe, Munck Carter, PC, Dallas, TX, Genice A.G. Rabe, Salem, OR, for appellee.

Before Justices MORRIS, FRANCIS, and MURPHY.

## OPINION

Opinion By Justice MORRIS.

In this appeal from a summary judgment, Jerry Gumpert and Martin Coyne contend the trial court erred in dismissing their claims against ABF Freight System, Inc. and the individual defendants, Barry Sircy, Tommy Walker, Robert Graves, George Warren, Perry Wayne Middlebrook, Richard Crawford, Richard Fiser, Daniel Noonkester, Richard Martinez, Richard Passmore, and Leonard Esner, Jr. for violations of the Texas Labor Code, conspiracy to violate the Texas Labor Code, libel, and conspiracy to commit libel. After reviewing the record on appeal, we conclude the trial court properly granted summary judgment on these claims as a matter of law and affirm the trial court's judgment.

## I.

ABF Freight System, Inc. is a freight-hauling company with a terminal located in Dallas, Texas. During the relevant time period, Jerry Gumpert and Robert Coyne were employed by ABF as line haul drivers. Both men, along with the individual defendants, were also members of the International Brotherhood of Teamsters Union Local 745.

Gumpert and Coyne contend that, starting sometime in 1997, the individual defendants began to create and post in public areas business cards and flyers containing defamatory statements about them. Many of the postings were sexually oriented in nature and included references to homosexual conduct. Other postings appeared to suggest that one of the men had falsified time entries in ABF's log book. Gumpert and Coyne complained to ABF management about the material being posted. Several managers investigated the situation and attempted to determine which employees were responsible. They discussed the feasibility of installing surveillance cameras to catch the perpetrators but determined it would not be effective. Several managers removed the postings as soon as they saw them. According to Gumpert and Coyne, however, ABF failed to take any effective action, and the postings continued. Both men stated the managers did not seem to want to get involved and one dispatcher appeared to encourage the actions of the individual defendants by making jokes and singing songs while at work with lyrics based on some of the postings.

In December 2005, Gumpert and Coyne filed this suit seeking damages. In their

petition, they asserted claims against ABF and the individual defendants for libel, conspiracy to commit libel, violations of sections 21.051 and 21.055 of the Texas Labor Code, and conspiracy to violate the Texas Labor Code.[1] Both ABF and the individual defendants filed motions for traditional and no-evidence summary judgments.

In its motion for summary judgment, ABF contended it was not directly liable for any violations of the Texas Labor Code because the alleged harassment was not based on sexual discrimination and ABF took prompt remedial measures. ABF further argued Gumpert and Coyne could not prevail on their retaliation claims under the Texas Labor Code because ABF had not subjected them to any materially adverse action and neither man was constructively discharged. ABF moved for both a traditional and a no-evidence summary judgment on the claims for conspiracy, arguing there was no evidence to support them and the claims were derivative and repetitive of the underlying claims. Finally, ABF argued it could not be liable for conspiracy because a corporation cannot conspire with itself.

The individual defendants sought summary judgment on Gumpert and Coyne's claims for libel, arguing the alleged postings were never published to third parties and were neither defamatory nor false in nature. As for the conspiracy claims, the individual defendants contended Gumpert and Coyne could not prove the underlying torts. In their request for a no-evidence summary judgment, the individual defendants argued Gumpert and Coyne could not produce any evidence to support the elements of their claims for libel or conspiracy.

After reviewing the evidence, the trial court granted summary judgment in favor of ABF and dismissed all claims asserted against it with prejudice. The trial court also granted summary judgment in favor of all but one of the individual defendants on the claims asserted against them for libel and conspiracy. The trial court did not dismiss the libel claim against Richard Crawford, but Gumpert and Coyne chose to file a non-suit of this claim rather than proceed to trial on the limited issue.[2] The judgment having been made final by the non-suit, Gumpert and Coyne brought this appeal challenging the trial court's rulings.

## II.

In a single issue, Gumpert and Coyne contend the trial court erred in granting summary judgment in favor of ABF and the individual defendants. The standard of review for a traditional summary judgment is well known. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex.1985). We must determine whether ABF and the individual defendants demonstrated that no genuine issues of material fact existed and they were entitled to judgment as a matter of law. *See id.* at 548–49. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. *See* Tex.R. Civ. P. 166a(i); *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33(Tex.App.-Dallas 2000, no pet.). We must determine whether the nonmovant produced more than a scintilla of probative evidence to raise a fact issue on the

1. Gumpert and Coyne also asserted claims for trespass, aiding and abetting, and conspiracy to assault or batter. They do not challenge the summary judgment on these claims.

2. The trial court also did not dismiss the claims asserted against Perry Wayne Middlebrook and Leonard Esner, Jr. for trespass. Gumpert and Coyne chose to dismiss these claims by non-suit rather than proceed to trial on them.

material questions presented. *See Gen. Mills,* 12 S.W.3d at 833. When analyzing traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant. *See Nixon,* 690 S.W.2d at 549; *Gen. Mills,* 12 S.W.3d at 833.

We begin our analysis with Gumpert and Coyne's challenge to the summary judgment in favor of ABF on their claims for violations of the Texas Labor Code. Gumpert and Coyne contend the evidence raises disputed issues of material fact on these claims. They argue there is more than a scintilla of evidence to show they were subjected to sexual harassment creating a hostile work environment. ABF responds that the discrimination claim must fail because the alleged harassment was not directed at the men because of their gender.

■ Gumpert and Coyne's claim for discrimination based on sex was brought under section 21.051 of the Texas Commission on Human Rights Act in the Texas Labor Code. TEX. LAB.CODE ANN. § 21.051 (Vernon 2006). Under section 21.051, it is unlawful for an employer to discriminate in any manner in connection with the terms, conditions, or privileges of employment because of the sex of the employee. *Id.* An employer may be held liable for sex discrimination if its employees commit acts of sexual harassment creating a hostile work environment. *See Wal–Mart Stores, Inc. v. Itz,* 21 S.W.3d 456, 472 (Tex.App.-Austin 2000, pet. denied).

■ In 1998, the United States Supreme Court addressed discrimination in the context, as is presented here, of a claim for sexual harassment based on the alleged conduct of co-workers of the same gender. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).[3] The court held that such claims were cognizable but stressed that the claimant must always prove the conduct at issue was *discrimination* because of sex and not merely conduct that is "tinged with sexual connotations." *Id.* at 81, 118 S.Ct. 998. Workplace harassment is not automatically discrimination because the words used have sexual content or overtones. *Id.* at 80, 118 S.Ct. 998; *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 268 (5th Cir.1998).

The Supreme Court went on to outline three ways in which a plaintiff could show that same-sex harassment amounted to sex discrimination. First, the plaintiff could show the alleged harasser made explicit or implicit proposals of sexual activity and provide credible evidence that the harasser was homosexual. *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998; *La Day v. Catalyst Tech., Inc.,* 302 F.3d 474, 478 (5th Cir. 2002). Second, the plaintiff could demonstrate the harasser was motivated by general hostility to the presence of members of the same gender in the workplace. *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998; *La Day,* 302 F.3d at 478. And third, the plaintiff could offer direct comparative evidence of how the alleged harasser treated members of both sexes in a mixed-gender workplace. *See Oncale,* 523 U.S. at 81, 118 S.Ct. 998; *La Day,* 302 F.3d at 478.

■ Gumpert and Coyne do not contend that any of the individual defendants were homosexual or that the individual defendants believed Gumpert and Coyne were homosexual. Neither do they contend that the individual defendants made either im-

---

3. The TCHRA was intended to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." *Id.* § 21.001(1). Accordingly, we look to federal precedent for interpretive guidance. *See Quantum Chemical Corp. v. Toennies,* 47 S.W.3d 473, 476 (Tex.2001).

plicit or explicit proposals of sexual activities. Instead, they contend the conduct at issue was, "as a matter of logic," discriminatory because it was directed only at males, namely Gumpert and Coyne, and those ABF employees who sympathized with them. Under Gumpert and Coyne's asserted logic, all acts of harassment could be considered discriminatory merely because they happened to be directed only at persons of one gender. This logic fails to distinguish between harassment that happens to be directed at persons of a particular gender and harassment that is directed at persons *because* of their gender. Only the latter can be discriminatory. *See Oncale,* 523 U.S. at 80, 118 S.Ct. 998.

ABF presented summary judgment evidence that showed the offensive postings and other alleged conduct were directed at Gumpert and Coyne because of disagreements they had with co-workers and not because they were men. Gumpert and Coyne's own testimony established the animosity against them stemmed from conflicts over things such as disputed work hours, membership in the local union, and seniority. Indeed, Gumpert testified in his deposition that the individual defendants did not make the postings "because [he] was a man." Coyne testified in his affidavit that only male employees, including him, Gumpert, and other men who sympathized with them, were subjected to the harassing behavior. Neither man, however, presented any evidence that there were any women employees who sympathized with them or who had similar work-related disputes with the individual defendants and were treated differently. In fact, both men testified in their depositions that they had not noticed the individual defendants generally treating women employees at ABF any differently than the male employees. Absent any direct comparative evidence, Gumpert and Coyne have failed

to raise an issue of material fact with respect to their claim for discrimination.

After reviewing the record, we conclude the trial court did not err in granting summary judgment to ABF on Gumpert and Coyne's claim for discrimination. All the evidence shows that the alleged harassment was directed at Gumpert and Coyne for reasons unrelated to their gender. Accordingly, their claim for discrimination must fail as a matter of law.

■ We next address Gumpert and Coyne's claims against ABF for retaliation under section 21.055 of the TCHRA. Section 21.055 prohibits employers from retaliating against their employees for engaging in protected activities such as opposing a discriminatory practice, making a charge, or filing a complaint. Tex. Lab. Code Ann. § 21.055 (Vernon 2006). In an action arising under section 21.055, the plaintiff must make a prima facie showing that: (1) he engaged in a protected activity, (2) an adverse employment action occurred, and (3) there was a causal link between the protected activity and the adverse action. *Dias v. Goodman Mfg. Co., L.P.,* 214 S.W.3d 672, 676 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). ABF argues that Gumpert and Coyne failed to provide any evidence of an adverse action taken against them by the company or a causal link between a protected activity and any alleged adverse action. We agree.

■ For an adverse action to be causally linked to the protected conduct, a plaintiff must show that the action would not have occurred *but for* the protected conduct. *See Strong v. University Healthcare System, L.L.C.,* 482 F.3d 802, 806 (5th Cir.2007). Mere temporal proximity between the adverse action and the protected conduct is insufficient evidence to show a causal link for the purposes of summary judgment. *Id.* at 807. Moreover, subjective belief as to the motivation for the

action is insufficient to defeat summary judgment. *See Bartosh v. Sam Houston State Univ.*, 259 S.W.3d 317, 330 (Tex. App.-Texarkana 2008, pet. denied).

██ The only alleged "adverse action" taken by ABF against Coyne was a purported disciplinary action taken after this case was filed. Coyne was told in 2007 that he was going to receive a warning letter in response to a complaint by a courtesy van driver in Laredo. The driver alleged that Coyne made crude remarks to him including suggestive comments about his wife and daughter. Although Coyne told his supervisor he never made the alleged remarks, Coyne states that his supervisor told him he had already decided Coyne was guilty. Coyne denied ever receiving a copy of the warning letter.

First, we note that this single alleged disciplinary action does not amount to a materially adverse employment action necessary to support a claim for retaliation. *See Grice v. FMC Techs. Inc.*, 216 Fed. Appx. 401, 407 (5th Cir.2007) (alleged retaliatory actions cannot be mere trivial harms). And second, even if the warning letter could be considered a sufficiently adverse action, Coyne has made no showing that the letter was linked in any way to his complaints about sexual harassment. Coyne makes a vague allegation in his brief that ABF knew the complaint against him was false and "proceed[ed] from a retaliatory motive." Coyne provides no evidence to support this allegation, however. Indeed, in his deposition testimony made part of the summary judgment record, Coyne stated he did not know of any action taken by ABF in retaliation against him.

█ Gumpert contends he was constructively discharged in retaliation for his sexual harassment complaints. Gumpert concedes that he submitted the necessary paperwork to retire voluntarily from his employment with ABF, but states he resigned from his job earlier than the paperwork indicated after all four of the tires on his personal vehicle were slashed. Gumpert goes on to argue that the offensive postings combined with the destruction of his personal property created an atmosphere so intolerable that he felt compelled to leave. The postings and alleged vandalism, however, were committed by Gumpert's co-workers, not ABF. *See Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir.1994) (factors relevant to constructive discharge include badgering, harassment, or humiliation *by the employer* calculated to encourage employee's resignation). In his deposition testimony, Gumpert stated that his managers and supervisors at ABF treated him the same after he filed his complaint as before any of the problems started.

To the extent Gumpert suggests that ABF failed to take appropriate measures to remedy the harassment, thus allowing the hostile work environment to exist, ABF's alleged failure to respond appropriately began long before Gumpert engaged in any protected activity. Accordingly, Gumpert cannot show a causal link between his harassment complaints and ABF's alleged failure to act. Based on the foregoing, we conclude the trial court properly granted summary judgment on Gumpert and Coyne's claims against ABF for retaliation and constructive discharge under section 21.005.

## III.

█ We next address Gumpert and Coyne's challenge to the summary judgment in favor of the individual defendants on their claim for libel. The petition asserted the individual defendants committed defamatory acts by posting offensive business cards and flyers accusing various ABF employees, including Gumpert and

Coyne, of lewd and criminal acts. After reviewing the record, however, we conclude that none of the material about which Gumpert and Coyne complain is defamatory as a matter of law.[4]

Whether a publication is capable of a defamatory meaning is initially a question of law for the court. *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 155 (Tex. 2004). In making this determination, the alleged defamatory publication must be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *Id.* at 154. The test is whether the publication could be reasonably understood as describing actual facts about its subject. *Id.* at 157. Accordingly, for us to determine whether the publications at issue are capable of a defamatory meaning, we must examine the circumstances under which the publications were made and decide whether they could reasonably be understood as describing actual facts about Gumpert and Coyne.

The summary judgment evidence shows that rude and offensive postings about employees at ABF began occurring long before the postings made the subject of this case. Both Gumpert and Coyne testified that they remembered a series of flyers referred to as "The Kolache Chronicles" posted in the Dallas ABF terminal. The Kolache Chronicles accused dispatchers and hostlers of giving preferential treatment to senior drivers in exchange for being provided with pastries known as kolaches. Later editions of the flyers included thinly veiled accusations of homosexual conduct between the drivers, dispatchers, and hostlers. The flyers were described as being perverted and mean-spirited and to include crude drawings and images. None of the Kolache Chronicle flyers referenced Gumpert or Coyne.

Coyne began experiencing difficulties at ABF shortly after he was assigned to the Dallas terminal. Coyne stated that, at first, he was resented for being an outsider. Then, as he rose in seniority at the company, he said he began to experience jealousy and vindictive behavior from other drivers. Coyne stated that some of the other drivers "were simply jealous of my seniority, and resented the fact that I was willing to work harder, play by the rules and, by doing so, fare a little better than those with less seniority." One of the older drivers, Tommy Walker, began referring to Coyne as "Big Monkey" rather than "Big Bear," Coyne's long-standing CB handle.

Sometime in 1996 or 1997, Coyne drove more than the maximum number of allowable hours for the week under Department of Transportation regulations. According to Coyne, he immediately discussed the matter with a supervisor and was told to "fix" his log book to remove the excess hours. Coyne changed his log book and, two days later, was told by the same supervisor that he would be issued two warning letters: one addressing the excess hours and the other addressing the falsified log book. When Walker found out about the warning letters, he began to verbally berate Coyne for falsifying his log

---

4. Gumpert and Coyne argue that the trial court necessarily rejected the argument that the publications were not defamatory when it denied summary judgment on their claim for libel against individual defendant Richard Crawford. On appeal, however, we may consider all grounds for summary judgment presented to the trial court that are properly preserved. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 625 (Tex.1996). In the interest of judicial economy, we can affirm a summary judgment on different grounds than those relied upon below. *See City of Garland v. Dallas Morning News,* 969 S.W.2d 548, 552 (Tex.App.-Dallas 1998), *aff'd* 22 S.W.3d 351 (Tex.2000).

books. A business card later appeared posted at the ABF Dallas terminal containing the words "Big Monkey Pro Logging Academy." Soon afterwards, however, Coyne was involved in an accident that required him to take an extended medical leave of over two years.

Coyne stated that when he returned from his medical leave, the other individual defendants joined with Walker in what appeared to be an intentional campaign to humiliate and abuse him. The campaign allegedly included verbal threats and tampering with Coyne's truck and his personal vehicle. In early 2004, Gumpert encouraged Coyne to go to ABF management to complain about the abuse. In addition, Gumpert, as well as a few other employees, openly criticized the individual defendants' actions.

After Gumpert began to support Coyne, a new business card appeared referencing "Squeeze Box temper tantrum training." "Squeeze Box" was Gumpert's CB handle. The card also advertized "How to Waffle When Caught" and "Tractor Swapping Techniques." The card appeared to reference an incident in which Gumpert had purportedly violated union rules by performing the job of a hostler and was assessed sanctions.

Beginning sometime in April 2004 and continuing until early 2006, a variety of other postings appeared at ABF terminals. The postings attempted to be humourous false advertisements but they included indirect and frequent references to homosexual conduct by Gumpert, Coyne, and other ABF employees who were sympathetic to them. One flyer entitled "Picnic & Benefit for Big Monkey and Squeezebox Legal Defense Fund" stated the event was sponsored by the "Greater Metroplex Gay Alliance." It also referenced games such as a "weiner pull & roast" and seminars including "how to whup ass and never touch anyone." The flyer concluded with the statement, "We need your help to raise money to begin attacks on PTA, YMCA and peaceful mothers of America."

A second flyer entitled "The Box Score" purported to be a sports report about nonexistent baseball teams, including the "Green Weenie Tag Team" made up of Gumpert, Coyne, and other ABF employees. This was followed by another business card that advertised "Ratsnitch, Inc." The card listed "Big Monkey" and "Famous Anus (Mr. Whup Ass)," along with others, as employees. According to Gumpert, the reference to "Famous Anus (Mr. Whup Ass)" was directed at him. The tagline of the business card was "We Will Rat on You. No Snitch Job Too Small."

The next flyer ostensibly advertised two books from "Monkeybone Publishing" entitled "We Truck in Tandem" and "I was a Monkeyman's Love Slave." The flyer said the first book was "a disturbing tale of the lebanese love affair between Roberta and Jerrice Gumpington." The character of "Roberta" was arguably directed at ABF employee Robert Pennington and Gumpert's name was likewise altered and feminized to become "Jerrice Gumpington." The summary of the book included such language as "you'll cringe as they let themselves be joined in a blasphemous ceremony officiated by a sub-human, gorilla-like creature from the depths of Hell!" According to the flyer, the second book was authored by Danielle Picante, an apparent reference to ABF employee Daniel Pace, and stated that "Danielle" would be hosting "bulletin board clearing seminars," apparently in reference to the removal of the earlier flyers and business cards from ABF's bulletin boards. The flyer also suggested that Pace and the "Monkey Master" would be engaging in a crude act in front of an audience.

The last two flyers included in the summary judgment evidence were even more crude. One was an advertisement for products made by "Monkeytronics" and "Squeezeco," including a "Sucklemaster" 15000 that was intended to help drivers perform sexual acts on dispatchers and relay managers. The other was a purported love letter from "Jerrice" to "Roberta" in which the former informed the latter that "she" had anal warts.

 In arguing that these postings were defamatory, Gumpert and Coyne admit that "some of the ridiculous events in the postings are clearly beyond reality (and would be seen as such by any reasonable reader)." But they go on to argue that "the basic bedrock assertions in all the postings are matters that could be understood by a reasonable reader as actual facts about Gumpert and/or Coyne." We must disagree because the "bedrock assertions" about which Gumpert and Coyne complain must be read in the context of both the "ridiculous events" described in the postings as well as the history of crudely satirical postings made at ABF. *See Isaacks,* 146 S.W.3d at 154 (falsity depends upon meaning reasonable person would attribute to whole publication, not technical analysis of each statement).

Gumpert and Coyne were not the first ABF employees to be made the subject of vulgar postings. Nor were they the only employees made the subject of the postings at issue. The Kolache Chronicles and the postings made the subject of this case were all similar in nature and were obviously the device of choice used against unpopular employees over many years. A person of ordinary intelligence could not reasonably believe that the numerous employees made the subject of the postings because of work-related disputes actually engaged in the conduct described. For example, one could not reasonably believe that all of the employees who were targeted over the years with accusations of homosexual conduct were, in fact, homosexuals. As Gumpert and Coyne concede, they did not think the individual defendants actually believed they were homosexuals; they merely believed the defendants used the accusation as a means of ridiculing them. Because the same conduct was directed at any employee who allegedly became a target of the individual defendants, the taunts could not be understood as asserting actual facts about any of them.

Furthermore, the exaggerated nature of each flyer and the obvious attempts at crude humor made them incapable of being taken as sources of factual information about the subjects. The flyers, although mean-spirited and offensive, were obviously satirical. Gumpert and Coyne contend the postings should not be permitted the usual protections afforded to satire because the subjects are private individuals rather than public figures. Because they are not public figures, Gumpert and Coyne argue that the constitutional protections given to satirical writings do not apply. We are not persuaded by this argument.

 Public figures generally "bear the brunt of satire" and, therefore, most of the analysis concerning constitutional protections for satirical writings revolves around the need for free-flowing public discourse about social and political figures. Although the analysis for defamation claims differs depending upon whether the subject is a private or public figure, the difference lies in the degree of fault that must be proven, not whether the publication is satirical. *See WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998). Public figures must show the defendant acted with malice, while private individuals need only show the defendant was at least negligent. *Id.* In both cases,

however, the person alleging he was defamed must first show that the publication was defamatory concerning him. *Id.* A publication can only be defamatory if it can reasonably be understood as conveying actual facts about its subject. *See Isaacks,* 146 S.W.3d at 157. When a publication is satirical to the extent that it cannot reasonably be understood as conveying actual facts, it is not defamatory as a matter of law regardless of whether the subject is public or private. *Cf. McKethan v. Tex. Farm Bureau,* 996 F.2d 734, 743 (5th Cir. 1993) (comments made about private individual at "roast" were clearly satirical and not defamatory).

■ To the extent the "bedrock assertions" made in the business cards could be understood as assertions of actual facts about Gumpert and Coyne, those assertions were true. Coyne admitted he falsified his hours in his log book on one occasion resulting in the "Big Monkey Pro Logging Academy" card. Gumpert admitted breaking regulations and performing the work of a hostler resulting in the "Squeeze Box" card. And finally, both men admitted reporting the behavior of the individual defendants to ABF supervisors, which prompted the "Ratsnitch, Inc." card. Assertions of fact that are true cannot be defamatory. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995).

Although the conduct of the individual defendants in this case was vulgar and puerile, it was not defamatory. None of the publications could be understood as conveying actual facts about Gumpert or Coyne. And to the extent the business cards may have been understood as conveying facts, those facts were true. Because the publications were not defamatory as a matter of law, we conclude the trial court properly granted summary judgment

against Gumpert and Coyne on their claims for libel.

■ Because we have concluded the trial court properly granted summary judgment against Gumpert and Coyne on their claims for violations of the Texas Labor Code and libel, we must also conclude the trial court correctly granted summary judgment on Gumpert and Coyne's claims for conspiracy to violate the Texas Labor Code and conspiracy to libel. Conspiracy is a derivative tort and liability is dependent upon participation in an underlying tort by at least one defendant. *See Preston Gate, LP v. Bukaty,* 248 S.W.3d 892, 898 (Tex.App.-Dallas 2008, no pet.). It is also unnecessary for us to address the cross-point of error brought by the individual defendants relating to the record on appeal.

We affirm the trial court's judgment.