**Opinion issued August 23, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00249-CV

————————————

**PATTI WHITMIRE CARLTON AND PAMELA REED, Appellants**

**V.**

**HOUSTON COMMUNITY COLLEGE, Appellee**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-25125**

---

## MEMORANDUM OPINION

Plaintiffs-appellants Patti Whitmire Carlton and Pamela Reed are both former employees of defendant-appellee Houston Community College (HCC). Their claims here arise primarily from their complaints about alleged sexual

harassment by HCC's Interim Chancellor, Norm Nielsen, and subsequent retaliation by HCC after they reported that harassment. The trial court granted summary judgment in HCC's favor on plaintiffs' retaliation claims, and the plaintiffs appealed here. We affirm.

## BACKGROUND

### A. Parties

HCC is a public college that is governed by an elected board of trustees. Christopher Oliver has served as a trustee since 1995, and served as chairman of the board in 2007. In 2006, when HCC's chancellor Bruce Leslie resigned, the board appointed Dr. Norm Nielsen as an interim chancellor pending a national search process to replace Leslie. The board eventually selected Dr. Mary Spangler for the chancellor position, and she took over in that role on March 5, 2007.

During the relevant time periods, Pamela Reed and Patti Carlton worked in HCC's Contract Training/Continuing Education department (CTCE). "Continuing Education" refers to non-credit classes offered to the community, and "Contract Training" refers to training programs provided to a particular company.

### B. Plaintiffs' Claims and HCC's Motions for Summary Judgment

Both Plaintiffs filed charges of discrimination against HCC with the Equal Employment Opportunity Commission on June 13, 2007. HCC learned of the

2

EEOC charges on June 29, 2007. Plaintiffs filed a federal lawsuit in October 2008, and filed this suit April 21, 2009.

In this state lawsuit, Plaintiffs sued HCC for (1) "sex discrimination and retaliation in violation of the Texas Commission on Human Rights Act. TEX. LAB. CODE §21.051 ("TCHRA")," (2) "hostile environment sexual harassment in violation of §21.051 of the TCHRA," (3) "retaliation in violation of § 21.055 of the TCHRA," (4) breach of employment contract, (5) invasion of privacy, and (6) intentional infliction of emotional distress. HCC filed a general denial and special exceptions. HCC also filed a plea to the jurisdiction, arguing that—as a community college—it has absolute immunity from tort liability. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.051 (Vernon 2011).

Plaintiffs later nonsuited their tort claims, as well as their breach-of-contract claim, and any attorneys' fees claim that is "derivative of a breach of contract cause of action." That same day, the trial court granted HCC's plea to the jurisdiction, expressly retaining jurisdiction only over "the retaliation claims under the Texas Commission on Human Rights Act" and ordering that "all other claims alleged in Plaintiff's petition and not nonsuited are dismissed with prejudice."

### C. The Underlying Dispute

The dispute giving rise to Plaintiffs' EEOC complaints and lawsuits centers primarily around Nielsen's conduct during his time as interim chancellor. HCC's

3

summary-judgment evidence established that, when Nielsen took over in that role, HCC's board of trustees charged him with overhauling the CTCE department. His experience and success in developing a national CTCE program during his 20-year tenure as president of Kirkwood Community College in Iowa was one of the main reasons the board actively recruited him to the interim position.

Nielsen assigned Dr. Charles Cook, Vice Chancellor of Instruction, to spearhead an internal assessment of CTCE. Cook already headed the CTCE division—a position assigned to him by Leslie before he retired—and he already supervised both Carlton and Reed. Cook in turn asked Larry Markey, Director of Grants and Special Projects, to lead the internal CTCE assessment.

## 1. Reed's March 29, 2007 Written Statement

In conjunction with her internal complaint at HCC that eventually led to this lawsuit, Reed gave a written statement to HCC in which she expressed her view of Markey as hostile, incompetent, and ignorant of matters relevant and important to the CTCE department. She specifically complained of an October 6, 2006 meeting at which she was "yelled at and humiliated in front of other Directors of CTCE by Larry Markey who was conducting the Directors' meeting; he agrees that he knows very little of CTCE." In Reed's view, Cook could not actually make her report to Markey because they were the same grade level. Her written statement included several examples of Markey's decisions and behavior she disagrees with that she

4

"mention[s] . . . simply to set the backdrop for the lack of knowledge of CTCE by Markey, his hateful and hostile temperament, as well as having alcohol on his breath most days and the support he gets from Cook to do whatever he wants regardless of the impact on others and regardless of any corruptive activities."

During the week of October 23–27, 2006, Reed learned that the "Plan" for restructuring CTCE had been completed by Cook and Markey and forwarded to Nielsen for presentation to HCC's Executive Team on Monday morning, October 20, 2006. After trying for about eight months to secure a meeting with Cook to complain about having "spent the better part of a year utilizing about 60% of [her] time 'cleaning up' behind Markey's 'oversight,'" Reed was finally able to meet with Cook that same week of October 23–27, 2006. There, Reed told Cook that Markey was "hostile, attacking, rude" and was "making major attempts at continued illegal activities and from what [she] could smell, drinking even more." Reed was dismayed when Cook told her that Markey was given oversight of CTCE because he "gets things done."

### a. Reed's first meeting with Nielson

Dissatisfied with the outcome of her meeting with Cook, Reed then sought a private meeting with Nielsen on October 27, 2006. She took her resume to the meeting and introduced herself. She "explained [her] concerns about the [CTCE reorganization] Plan being presented to the Executive Team and being adopted

without any perusal by the CTCE Directors of the System Office of CTCE," and Nielsen "seemed to listen to [her] concerns and at the closing of [the] meeting indicated he was not going to move forward with it yet, and that he too had many concerns with it and thanked [her] for coming forward." At that meeting Reed also "explained to him [her] frustration with Markey and Cook and the abusive behaviors by Markey and that [HCC's] HR Generalist and our head of EEO had both said to [her] that 'there is no such thing as a hostile work environment unless it involves sexual harassment.'"

When Reed told Nielsen that she did not want to quit "in spite of all of this as I did love my job and also am not that far from retirement age," Nielsen responded that he thought she was "about 40" and that he "had noticed what a great body [she] has." Neilsen also told her he really wanted to continue picking her brain about CTCE issues, but suggested they meet again off campus because Nielsen "would prefer Cook or Markey not know." Meeting off campus made sense to Reed "since Markey and Cook were keeping all the information to themselves and not allowing CTCE Directors any knowledge of what they had put forth to [Nielsen] and Markey took great pleasure in smirking at all of us that he knew what was in the plan and we did not." At Nielsen's request, they exchanged home and cell phone numbers "so he could reach [her] on a non HCC phone if needed." Reed believed that he "was truly interested in getting information from a

6

long time CTCE person who had been at one of the colleges and at the system and who knew many of the hidden issues." Reed ran into Cook immediately after this first meeting with Nielsen, and Reed reiterated to Cook her view that Markey was hostile and engaged in illegal activity.

### b. Reed's second meeting with Nielson

According to Reed's written statement, at Nielson's suggestion she met him at Ibiza Restaurant on November 2, 2006 to "continue [their] conversation regarding the restructuring of CRCE." Reed secretly recorded their meeting, she explained, "as I was still feeling a bit uneasy about his motives since he had made remarks about my body and insisted on picking me up at my house for our off campus meeting even though I insisted that I meet him at the restaurant and did not want him to pick me up at my home." During the course of the dinner, Nielson made several suggestive comments, asking if he was too old for Reed, and commenting on her great body. He also discussed the "frequency of the average couple's sex life and began expounding upon statistics he had read." Reed attempted to bring the subject back to CTCE. At the end of the evening, Nielson requested another meeting "to continue the CTCE reorganization discussions."

### c. Reed's third meeting with Nielson

Reed met with Nielson again on November 15, 2006 at Bonnie's Restaurant. At that dinner, they discussed the three top positions to be created in CTCE.

7

Nielson recommended that Reed apply for "Executive Director of Continuing Education System." He asked her questions about her current responsibilities so he could incorporate those into the job description for that position. He then suggested that Reed persuade one of her co-workers, Madeline, to apply for the position of "Executive Director of Corporate Training" so that they would not be in the running for the same position. Finally, Nielson expressed his preference that the third position, "Associate Vice Chancellor of CTCE" position be an "external-only" posting and explained that he had "a couple of highly qualified people in mind."

During their dinner, Nielson inquired whether Reed missed him, and referenced her great body. Reed explained in her written statement that, if he had "not been someone with power and influence over [her] job and impending promotion, [she] would have made far more harsh remarks and shut him down the first time he said anything." She thought the better course of action was to ignore and keep him fended off because that would be beneficial to the restructuring, her promotion, and the college.

### d. Reed's fourth meeting with Nielson

After their dinner at Bonnie's, Reed made the assumption that Nielson had given up pursuing her, which reduced their contact. On December 7, 2006, she went to his office to express her continued concerns about corruption within CTCE

8

by Markey and Cook. He gave her the same response he had given previously: he was only at the school for a short period of time to do specific things and her complaints about corruption were not part of his area of concern.

### e. The CTCE job postings

Later, when three jobs were posted, Reed applied for both Director of Continuing Education and Associate Vice Chancellor of CTCE. When Reed went to the first interview for the Associate Vice Chancellor position, she was shocked to see the screening committee members. At their dinners, Nielson had asked Reed for a list of her enemies that should be kept off the selection committees for the positions to increase her chances. She told him it "would help" if Markey, Cook, and Maya Durnovo (Dean of Workforce at NW College) were not on the committees because "they had all been a part of much of the corruption" Reed had been reporting over time. It was clear to her, when she saw the committees, that Nielson had instead taken suggestions from Cook and Markey. Reed's statement identifies one committee member who she had suggested, and criticizes all the others as being friends with Cook or with Durnovo.

According to Reed, neither of the internal HCC candidates who became finalists for the Associate Vice Chancellor position had as much experience as Reed or her co-plaintiff, Carlton. HCC eventually gave the Associate Vice Chancellor position to Dan Seymour, whose "resume reflects no experience in

9

CTCE, but rather he is an academic and a consultant." By Seymour's own admission, Reed pointed out, he had worked with both Nielson and Spangler (HCC's new Chancellor), and it is thus "crystal clear that Nielsen and Spangler decided to bring in someone they knew in the past rather than someone who was truly qualified." In fact, the position of Associate Vice Chancellor had been reopened after the posting closed, and Reed believed that was because "after Mary Spangler was hired in mid-December even though she was not to start until February or ultimately March, they both decided they wanted Dan Seymour to apply, especially since Nielsen had already said that he had external people in mind."

Reed also interviewed for the Director of Continuing Education position. After initially being informed that she did not make it as a finalist for that position, she called Nielsen on January 31, 2007 and complained again that she had "major concerns about the input from Cook and others to the committee since it was obvious he had put people on the committee based on Cook's preferences." According to Reed, Nielsen was rude in response, and "reiterated that he had no interest or care in who got the jobs as he was leaving."

### f. Reed's sexual harassment allegations

During their January 31, 2007 call, Reed informed Nielsen that her supervisor, Patti Carlton, was in her office and that she was putting Nielsen on

notice that she was disclosing to Carlton his "sexual harassment of her over the past months and of his retaliation utilizing the selection committee he chose to ensure or most likely prevent a promotion" for her. Reed's written statement also asserts that Carlton disclosed to Reed on that same day that she and another woman at HCC had been sexually harassed by Nielsen.

## 2. Carlton's March 29, 2007 Written Statement

Carlton also provided a written statement in conjunction with her internal complaint that eventually gave rise to this lawsuit. She devoted some of that statement to complaints about how her position and pay grade had been handled before Nielson was hired as Interim Chancellor. The remainder of her statement, "entitled harassment and discrimination," dealt with Nielson's time at HCC.

### a. Carlton's first meeting with Nielson

On August 22, 2006, Carlton first met with Nielson, and he told her that he planned to reorganize CTCE, "to centralize the operation and have it managed from the system in place of the current structure that was in operation at each college," and to "create new positions of Associate Vice Chancellor of [CTCE], as well as Executive Director of Continuing Education and an Executive Director of Contract Training." When Carlton indicated her interest in the Associate Vice Chancellor position, Nielson responded that he would "only be advertising that position externally" because he wanted "someone with more potential for

11

longevity and less baggage." When Carlton retorted that she did not "have one foot in the grave," he responded that "I'm surprised that you are not already retired. You should try it. I'm enjoying the heck out of it." Carlton took this statement to be discriminatory about her age. At one point in the meeting, when she inquired "What will happen to me?," Nielson "moved his hand across the table near [hers] and said 'I don't know. We will have to work on that. Leave it to me.'"

### b. Carlton's second meeting with Nielson

On October 31, 2006, Carlton emailed Cook and Nielsen outlining her "deep concern that [she] had been excluded from all CTCE activities and planning associated with the reorganization of CTCE." On January 5, 2007, Carlton and Nielson met again at Carlton's request to discuss her "title, grade, and CTCE reorganization concerns." She had applied for the Associate Vice Chancellor of CTCE position but, in light of comments Nielsen had made about wanting to hire an outside candidate, she brought to Nielsen a proposal for upgrading her pay grade status and title in exchange for withdrawing her application for the Vice Chancellor position.

During that meeting, Nielsen leaned across the table toward Carlton, smiled, and said, "How is your husband doing?" She responded, "He's fine." Nielsen added, "He's a lot older than you, isn't he?" When she explained, "Well, yes, he

12

is, but he is still working at M.D. Anderson," he said "Well if anything ever happens to him, I hope that I will still be in the running." This comment upset Carlton, especially given that Nielsen was aware that her husband had been seriously ill with an inflamed cranial artery and a back injury. In response, she reiterated that she was offering a proposal to upgrade her position in exchange for withdrawing her Associate Vice Chancellor application "since you have already told me that I am too old and that you want someone with more potential for longevity." Nielsen smiled and said, "Why you don't need to withdraw. You're a pretty young thing, and you are more than qualified. That was a poor choice of words and I apologize. So, go ahead and sue me." He "then laughed and mentioned some kind of grievance that had been filed against him when he worked at Kirkwood." At the end of the meeting, Nielsen asked Carlton to email to him her proposed new areas of responsibility for her position. She did so and, after he responded with "[t]hanks for the input," she never heard from him again about her pay grade or position.

### c. Carlton's application and interview for the Associate Vice Chancellor position

Carlton was interviewed for the Associate Vice Chancellor of CTCE, but was not selected as a finalist. She considered the interview a mockery because she believed that Nielsen had already selected someone else. That time period was very stressful, and Carlton had "found it necessary to visit with [her] primary

13

physician due to concern about a spike in blood pressure readings." Based on information she heard through the grapevine, Carlton believes the committee may not have received all her application materials demonstrating her qualifications, and that Nielson gave the committee instructions that made it difficult for it to consider internal candidates like herself.

### d. Carlton's concern about abuse of herself and others

Carlton's written statement expressed concern about Nielsen's behavior being offensive, and complained about an Accounts Payable supervisor's sexual harassment of her grandson and about Nielsen's sexual harassment of Reed and another employee, Keeney Harrington.

### e. Carlton's internal complaint to HCC

Carlton's written statement references a February 5, 2007 letter to the HCC Board Chair, Christopher Oliver, reporting Nielsen's sexual harassment of senior female administrators of the college. Carlton did not like the first two investigators proposed by the college, as they had ties to HCC or its lawyers. She expressed dismay that Nielsen was not removed pending the investigation.

### 3. Allegations in Plaintiffs' Petition

Plaintiffs' petition lifts largely from their written statements summarized above, and contains additional allegations related to HCC's investigation. Specifically, the petition alleges that Harrington (not a party to this suit), perceived

14

to be the leader of the three women, "was fired on trumped up charges." Then, the petition alleges, "Spangler acted to further retaliate" against Carlton and Reed, burying them "beneath denied promotions and restructuring, a corporate euphemism for retaliation." Seymour, who was hired as Associate Vice Chancellor of CTCE, is alleged to have given Reed busy work, and "dumbed down" her job.

Plaintiffs' petition also complains that Reed's and Carlton's offices were vandalized, with Reed's trashcan being sliced into strips and Carlton's display of family photos being placed down in disarray. Reed and Carlton viewed this as a threat.

Plaintiffs' petition also complains of "the next attempt to deter" Reed, which it describes as "Board of Trustee Chair, Christopher Oliver, standing near where Reed was standing in a hallway and making very sexual rude 'animal humping' sounds at her." "When Reed looked at him he laughed at her." The petition goes on to allege that, "Later, Reed had to pass by Oliver and another male (an attorney for the HCCS' Board of Trustees) who had reportedly been in the restroom when Oliver was waiting in the hallway and making the obscene sounds at Reed. When Reed passed by the two of them, the men looked at her and laughed." According to plaintiffs, when Reed complained about this incident, HCC performed an unsatisfactory investigation designed to whitewash Oliver's misconduct.

15

On January 20, 2007, Reed was taken to the hospital with high blood pressure after "she had been threatened and verbally assaulted by Daniel Seymour in her office." According to the petition, this "hypertensive episode resulted in a disabling ischemic stroke verified by [her] neurologist." Ultimately, plaintiff's petition asserts that "[b]oth Carlton and Reed were advised for their health to involuntarily resign."

In support of Plaintiffs' retaliation complaint (the only live claim at the summary-judgment stage), the petition alleges:

> Plaintiff timely filed a charge of sex discrimination with the EEOC and the TCHR. Subsequent to the filing of this charge, Plaintiff's supervisors and co-workers retaliated against Plaintiffs for taking such action. Despite Plaintiffs' complaints regarding such retaliation, Defendant took no action to curtail or stop the retaliation. The retaliatory conduct continued until Plaintiffs were constructively discharged from their employment with Defendant.

### D. HCC's Motions for Summary Judgment

HCC filed summary-judgment motions challenging Reed's and Carlton's claims on both no-evidence and traditional grounds. On no-evidence grounds, it challenged the lack of evidence of an adverse employment action for having complained about Nielsen. On traditional grounds, it argues that its evidence demonstrates that there is no genuine issue of material fact on the plaintiffs' retaliation claims, as any "decisions that HCC made were legitimate and non-retaliatory, and [Plaintiffs] ha[ve] not shown that HCC's reasons are a pretext for

16

unlawful retaliation." HCC's summary judgment evidence laid out (1) the timeline and process for its employment decisions, and (2) its process of HCC's investigation of Plaintiffs' complaints.

### 1. HCC's Employment Decisions

On December 1, 2006, Nielsen distributed a memorandum to all employees announcing details of the proposed CTCE reorganization. This structure was the result of a study and proposal Nielsen commissioned from an outside organization. Later the same week, the newly created Associate Vice Chancellor of CTCE position was posted, and 71 people eventually applied, including Carlton and Reed.

The application deadline for the Associate Vice Chancellor position was early January 2007. HCC put together a six-person committee to screen the Associate Vice Chancellor applications. Don Washington, the Human Resources' Department Director of Employment, and Willie Williams, Human Resources' Associate Vice Chancellor, both assisted Nielsen in selecting members of the committee, with a goal of ensuring that the committee was diverse and included individuals with knowledge of the relevant fields. Dr. Orfelina Garza, President of the Southeast College, was selected as the chair of the committee. The other five members were: Johnny Sessums, Interim Deal of Workforce Development; Van O'Neal, Department of Transportation Chair; Evelyn McClain, Training Specialist; Gil Ontiveros, Adult High School & Alternative Education Supervisor; and Celia

17

Gee, Director of Administrative Services. These committee members were announced in early December 2006.

Nielsen charged the committee with interviewing and ranking candidates, taking into consideration prior experience and whether a candidate would be a good fit for HCC (including getting along well with other leadership) and giving particular weight to candidates who were creative and entrepreneurial. Nielsen did not suggest particular candidates, nor did he express a preference for internal or external candidates.

Following a committee screening process in January 2007, Carlton's application ranked 10th and Reed's ranked 13th. The committee then interviewed the candidates, with all candidates being asked the same questions. After this first round of interviews, Carlton dropped to 11th and Reed moved up to 6th. Neither Reed nor Carlton proceeded to the next level because only the top five were selected as finalists.

Reed, but not Carlson, also applied for a newly created Director of Continuing Education. These interviews took place on January 30, 2007 before the same six-person committee. Initially, Reed did not advance to the finalist stage. HCC's director of employment and the screening committee chair expressed their concern to Nielsen that the pool of finalists was too small because two of the three finalists were also finalists for the Associate Vice Chancellor of CTCE position.

On January 30, 2007, committee member Evelyn McClain thus notified the screening committee via email that the pool was expanded. That expansion resulted in Reed's inclusion on the list of finalists.[1] On February 2, 2007, however, the screening process for the newly created director positions was put on hold because several of the Associate Vice Chancellor applicants had expressed a desire, if selected for that position, to be involved in the process of selecting the directors that he or she would supervise.

The Associate Vice Chancellor position was offered to Daniel Seymour, the top-ranked candidate after interviews. Seymour had worked with Spangler several years earlier at a community college in California. Seymour is a Fulbright Scholar, had authored numerous books relating to higher education, and had 12 years' experience in senior-level positions in higher education. Members of the committee were impressed with his interview and felt he had a good grasp of the needs of the position. The members of the committee did not know about Reed's or Carlton's sexual harassment allegations against Nielsen, nor were they pressured to rank any candidate a certain way.

Nielsen's last day at HCC was February 26, 2007. Seymour began work in the Associate Vice Chancellor of CTCE position on March 1, 2007, and Spangler

---

[1]    Reed had not yet been notified about the expanded pool when she called Reed on January 31, 2007 to complain about not advancing and to tell him she was filing a sexual harassment complaint.

took over as HCC Chancellor several days later. On March 23, 2007, Spangler directed Seymour to prepare a final plan for a reorganization of the CTCE department. Seymour set about drafting that plan by reviewing prior assessments and reports, attending meetings, and speaking with numerous personnel in CTCE, including Reed and Carlton. On May 4, Seymour unveiled the reorganization plan. As part of this reorganization, new positions were created and some existing positions were modified. Reed's and Carlton's responsibilities, while remaining largely the same, were revised in some areas to reflect the new organizational chart and work flow. Both Reed's and Carlton's salaries remained the same.

## 2. HCC's Investigation of Plaintiffs' Complaints

Oliver received Carlton's letter complaining of Nielsen's harassment on February 8, 2007, which he immediately forwarded to the Board's legal counsel to ensure that he followed all the proper procedures and laws. He notified Nielsen about the complaint and told him not to contact plaintiffs or make any decisions affecting them in his last few weeks at HCC. Oliver also called Spangler to inform her about the complaint against Nielsen and asked her if she could assume her duties at HCC early to minimize disruption in light of these developments.

On February 12, 2007, Oliver notified Plaintiffs that an investigation had begun. In that notification, he asked that any concerns about retaliation be brought to his attention, and he emphasized HCC's commitment to conducting an impartial

investigation. HCC's in-house counsel, Miles LeBlanc, initially engaged Elizabeth Kroger, a board-certified employment lawyer, to conduct the investigation, and he contacted plaintiffs' lawyer on February 14, 2007 to facilitate interviews. Plaintiffs objected to Kroger, and so LeBlanc hired Richard Hightower, a mediator. The plaintiffs objected to Hightower, so LeBlanc next hired Wendy Sicola, an employment investigator. She had never done work for HCC, and did not know the plaintiffs, Nielsen, or the lawyers.

Plaintiffs delayed almost a month in providing the written statement outlining their complaints that HCC requested. Over a period of two months, LeBlanc and Sicola unsuccessfully tried to schedule interviews with the plaintiffs. Sicola finally notified plaintiffs' lawyers that the investigation would conclude on May 11, 2007 with or without their interviews. She did not receive a response. After she received a facsimile from plaintiffs' lawyer in June, she reopened the investigation and again offered to interview the plaintiffs. Again there was no response, and she closed the investigation.

Sicola prepared detailed investigation reports based on 16 interviews. The reports provide a summary of those interviews, along with all the documentary evidence reviewed, and contains the following conclusions:

a. **Pamela Reed**

1. The investigation revealed that Nielsen complimented Reed's appearance and engaged in conversation of a sexual nature on at

21

least three occasions. The evidence is insufficient to determine if Nielsen tried to pressure Reed into a sexual relationship.

2. The investigation revealed that Nielsen and Reed talked at length about the CT/CE program, Reed's concerns about Markey and Cook, Reed's ideas about how to improve the program, and Reed's ideas about an appropriate position for her within the new program.

3. The investigation revealed that Nielsen did not influence the screening committee's decision on the finalist for the [Associate Vice Chancellor of] CT/CE and Directors positions.

4. The investigation revealed that Nielsen did expand the committee's list of Director finalists from three to six, which included Reed's name, and that he gave Reed high recommendations when speaking to Seymour about her. The investigation also revealed that Nielsen did not make any negative comments about Reed to any of the witnesses involved. The evidence was insufficient to conclude if Nielsen promised Reed a position in the new structure.

5. The investigation revealed that Spangler gave Seymour instructions to abandon Nielsen's prior instructions to proceed with the Director positions, and directed Seymour to make his own assessment before proceeding.

6. The investigation revealed Nielsen did not influence Seymour on how to structure the new CT/CE organization and did not recommend Seymour to hire or not hire anyone for a specific position. The investigation revealed Seymour has not communicated with Nielson since March 1, 2007.

7. The investigation revealed that when allegations were made against Nielsen, the Board sought legal advice on how to proceed. This was the first time sexual harassment charges had been made against a Chancellor, and therefore, not comparable to other claims which were handled by HR. Spangler is creating a method/position to handle all complaints in a consistent manner.

**b. Patti Whitmire Carlton**

1.  The investigation revealed that Nielsen told Carlton something to the effect that he wanted the [Associate Vice Chancellor]-CT/CE to have new ideas and no "baggage." He later regretted making the comment because it could appear to be inappropriately related to Carlton's age. Nielsen apologized to Carlton for making the comment.

2.  The investigation revealed that Nielsen did believe that an external candidate would likely be the best fit for the new AVC position; however, all witnesses agreed that Nielsen did not tell anyone to only focus on external candidates. The evidence indicated that Nielson did not have a particular individual in mind for the AVC position before he interviewed Daniel Seymour.

3.  The evidence was insufficient to conclude if Nielsen made a comment about Carlton's physical appearance.

4.  The evidence was insufficient to conclude if Nielsen made inappropriate innuendoes about a potential sexual relationship between Nielsen and Carlton. The investigation revealed that Nielsen asked Carlton about her husband's health more than once.

5.  The investigation revealed that when allegations were made against Nielsen, the Board sought legal advice on how to proceed. This was the first time sexual harassment charges had been made against a Chancellor, and therefore, not comparable to other claims which were handled by HR. Spangler is creating a method/position to handle all complaints in a consistent manner.

### E. The Trial Court's Judgment

The trial court granted summary judgment on Plaintiffs' retaliation claims. Plaintiffs filed a motion for new trial, attaching new affidavits as evidence. The trial court denied the motion, and Plaintiffs timely appealed.

## ISSUE ON APPEAL

In one issue, Plaintiffs argue that the "trial court erred in granting summary judgment against Carlton and Reed."

## STANDARD OF REVIEW

We review a trial court's summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). If a trial court grants summary judgment without specifying the grounds for granting the motion, we must uphold the trial court's judgment if any of the grounds are meritorious. *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 148 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). When a party has filed both a traditional and no-evidence summary judgment motion and the order does not specify which motion was granted, we typically first review the propriety of the summary judgment under the no-evidence standard. *See* TEX. R. CIV. P. 166a(i); *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the no-evidence summary judgment was properly granted, we need not reach arguments under the traditional motion for summary judgment. *Ford Motor Co.*, 135 S.W.3d at 600.

To prevail on a no-evidence motion for summary judgment, the movant must establish that there is no evidence to support an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex.

24

App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the nonmovant to present evidence raising a genuine issue of material fact as to each of the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Hahn*, 321 S.W.3d at 524.

In a traditional summary judgment motion, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).

## RETALIATION CLAIMS UNDER THE TCHRA

The TCHRA generally prohibits employment discrimination on the basis of race, gender, age and other protected classes, and also prohibits retaliation against employees who complain of discrimination. TEX. LAB. CODE ANN. §§ 21.001–21.556 (Vernon Supp. 2011). The TCHRA is patterned after Title VII of the Civil Rights Act of 1964, the federal anti-discrimination law. *Id*. § 21.001(1). Plaintiffs' retaliation claims are premised on three Labor Code sections:

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or

25

employment agency retaliates or discriminates against a person who, under this chapter:

> (1) opposes a discriminatory practice;
>
> (2) makes or files a charge;
>
> (3) files a complaint; or
>
> (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

TEX. LAB. CODE § 21.055.

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency aids, abets, incites, or coerces a person to engage in a discriminatory practice.

TEX. LAB. CODE § 21.056.

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency willfully obstructs or prevents a person from complying with this chapter or a rule adopted or order issued under this chapter.

TEX. LAB. CODE § 21.058.

Before an employee may sue for violation of the TCHRA, he or she must first file an administrative charge with either the Texas Workforce Commission (TWC) or the Equal Employment Opportunity Commission (EEOC) within 180 days of the discriminatory act. *Id.* § 21.202 (a). This requirement is jurisdictional. *See Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.3d 490, 492 (Tex. 1996).

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected activity; (2) the employer took an adverse employment action; and (3) it did so because of the plaintiff's participation in the protected activity. *E.g.*, *Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 518 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). To satisfy this causation showing, the plaintiff must establish that without the protected activity, the employer's prohibited conduct would not have occurred when it did. *See Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995). In other words, the plaintiff must establish a "but for" causal nexus between her protected activity and the employer's prohibited conduct. *Tex. Natural Res. Conservation Comm'n v. McDill*, 914 S.W.2d 718, 723 (Tex. App.—Austin 1996, no writ). The plaintiff need not establish, however, that her protected activity was the sole cause of the employer's prohibited conduct. *Hinds*, 904 S.W.2d at 635.

Once the employee establishes a prima facie case, the employer bears the burden to rebut the alleged improper termination by producing evidence that a legitimate reason exists for termination. *Green*, 199 S.W.3d at 519. If the employer satisfies its burden of production, the burden shifts back to the employee to raise a fact issue as to pretext and a retaliatory motive. *Id.*

## ANALYSIS

As a threshold matter, the parties disagree about whether the trial court could properly have considered plaintiffs' summary-judgment arguments (that fail to cite to evidence), or plaintiffs' summary-judgment evidence (because plaintiffs' affidavits simply verify that the facts in the summary-judgment response are true). The parties also disagree about whether plaintiffs' EEOC charges were broad enough to encompass all of plaintiffs' claims in this lawsuit and, thus, effectively exhaust plaintiff's administrative remedies. Because we conclude that the evidence does not raise a fact issue on plaintiffs' retaliation claims—even considering all plaintiffs' claims and evidence—we affirm the trial court's summary judgment without addressing these issues.

The parties agree that plaintiffs engaged in two protected activities: (1) filing their February 5, 2007 internal sexual harassment grievance with HCC, and (2) filing their June 29, 2007 EEOC complaint. Plaintiffs additionally argued in their response to HCC's motion for summary judgment that several other activities constituted protected activity, including their ongoing complaints about corruption and unfair treatment directed at them under the new CTCE organization.

The adverse employment actions alleged by plaintiffs are (1) plaintiffs' non-selection as finalist for the Associate Vice Chancellor of CTCE and Reed's non-selection for a CTCE Director position, (2) plaintiffs' effective demotions and

reduced responsibilities with the May 2007 CTCE reorganization, (3) HCC's unfair investigation of Reed's and Carlton's sexual harassment complaints, and (4) plaintiffs' constructive discharge caused by hostile acts, including Oliver making a grunting noise at Reed, and Seymour's assaulting Reed.

We agree with HCC that (1) plaintiffs failed to raise a fact issue on their claim that the adverse employment actions alleged by plaintiffs were taken because of plaintiffs' engaging in protected activity, and (2) as a matter of law, some of plaintiffs' allegations do not rise to the level of an adverse employment action. We thus affirm the trial court's summary judgment on plaintiffs' retaliation claims.

## A. Plaintiffs' Non-Selection for the New Associate Vice Chancellor Position and Director Positions

Both Reed and Carlton applied for the Associate Vice Chancellor of CTCE position, and Reed also applied for Director of Continuing Education. Neither Reed nor Carlton was selected for either of these positions. Plaintiffs concede that HCC put forth "non-retaliatory reason[s]" for plaintiffs' non-promotion to these positions. They argue, however, that the "pretextual nature" of the proffered reasons was clear.

With regard to Reed, plaintiffs assert that she rebuffed Nielsen's unwanted sexual advancements. They then argue that it is reasonable to infer from the evidence that Nielsen purposely put her enemies on the selection committee.

29

As for Carlton, plaintiffs assert that "Nielsen informed Carlton that he wanted someone younger for the [Associate Vice Chancellor of] CTCE position, an illegal discriminatory statement." Plaintiffs also note that Nielsen made "suggestive statements to Carlton such as, 'Don't worry, I'll take care of you.'"

Although HCC brought forth evidence that the committee was selected through a neutral process with input from people other than Nielsen before plaintiffs' lodged their complaints about Nielsen, Plaintiffs' brief nonetheless alleges that the committee's make-up was retaliatory:

> Although HCC claims that Don Washington and Willie Williams helped formulate the committee and had no knowledge of Nielsen's sexual harassment of Plaintiffs, it is reasonable to infer, and a material fact question for a jury, that Nielsen acted as the 'man behind the curtain' and either influenced their choices or made seemingly innocuous suggestions, or knew that Washington and Williams had a bone to pick with Carlton or Reed. After all, when Reed saw who was on the committee and realized her chances for promotion were effectively destroyed, she called Nielsen on January 21, 2007 to express her concerns. Nielsen, having realized that he was not going to get Reed into bed, reacted negatively, telling Reed he didn't care who got the job because he was leaving. Reed felt Nielsen had retaliated against her by placing her "enemies" on the selection committee, and informed him that she was filing a sexual harassment complaint.

Plaintiffs' brief does not explain in what regard Washington and Williams had a "bone to pick" with Carlton or Reed.[2]  And, while the plaintiffs' brief lumps

---

[2]  This notion conflicts somewhat with Reed's earlier assertion that it was Nielsen's hostility towards Reed that led to the committee selection, rather than animus on

together their retaliation allegations, Carlton has not otherwise claimed that the committee was made up of her enemies; she in fact admitted the opposite in her deposition, i.e., that she did not have prior friction with those on the committee.

As a threshold matter, it is axiomatic that—to support a retaliation claim—a decision-maker must know about the plaintiffs' exercise of a protected activity. *E.g., Marsaglia v. Univ. of Tex.-El Paso*, 22 S.W.3d 1, 4 (Tex. App.—El Paso

---

the part of the Washington and Williams. In her written statement in support of her internal complaint, she asserted specifically:

> [Nielsen] asked if I had any enemies that he should make sure weren't on the selection committee . . . which seemed strange, but I told him as long as Larry Markey, Charles Cook or Maya Durnovo (Dean of Workforce at NW College) were not on it that would help as they had all been a part of much of the corruption I had reported over time. . . . He had asked who I thought would be good CTCE people that would be knowledgeable to be on the committee and yet not applying for any of the jobs. I provided some names for him which he wrote down. . . . I was shocked when I saw the committee members. It was crystal clear that he had gotten names and suggestions from Charles Cook and Cook via Larry Markey. There was ONE person who I had suggested who was former CTCE and extremely knowledgeable but had left and moved to HR to another position. Other than her, he had put Fena Garza (President of the SE College) as Chair of the committee. She is drinking, traveling, poker playing friends with Charles Cook and the former President of SW College, Sue Cox. To have her on the committee was the same as having Cook or Larry on it or even Maya Durnovo as Fena Garz and Maya were close for years and I assume still are. Also on the committee were not one, but TWO of the people who had departments in which much corruption had been occurring and of which I had informed the chancellor. It was as if he had intentionally chosen people either at Cook's direction or people that he knew would have reason to not want me even at the college much less in a higher position due to what I know of their corruptive practices.

31

1999, pet. denied). Here, the committee was put together at least a month before plaintiffs made any sexual harassment complaints, either internally or to the EEOC. In other words, although plaintiffs allege that Nielsen improperly influenced the selection of the members of that committee in retaliation for their complaints about sexual harassment, the committee was selected long *before* either plaintiff complained, a fact fatally inconsistent with their theory.[3]

HCC's summary-judgment evidence demonstrates a nondiscriminatory reason for plaintiffs' non-promotion by showing that the candidates chosen over plaintiffs gave better interviews and ultimately scored higher in the evaluation process. While plaintiffs clearly disagree with the assessment of the relative merits of the candidates, no fact issue is created by such disagreement. As the Dallas Court of Appeals recently explained, a retaliation claim cannot be supported by the mere assertion that the plaintiff was a better choice for a particular position:

> Merely disputing [the employer's] assessment of [plaintiff's] qualifications will not create an issue of fact. *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Federal and state laws protecting employees against discrimination and retaliation were not intended to be vehicles for judicial second-guessing of employment decisions nor intended to transform courts into personnel managers. *See Jaso v. Travis County Juvenile Bd.*, 6 S.W.3d 324, 332 (Tex. App.—Austin 1999, no pet.). Absent a discriminatory motive, a

---

[3] There is also no evidence—only plaintiffs' speculation—that Nielsen interfered with the committee's decision-making. HCC's summary-judgment evidence demonstrated the opposite, that the committee members reviewed the applications on their own, conducted their own interviews, engaged in their own impartial review and were not pressured to select any particular applicant.

> disagreement between an employer and employee over assessment of job performance is not actionable. *Evans* [*v. City of Houston*], 246 F.3d [344,] 355 [(5th Cir. 2001)]. Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason for [an employment action]. *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir.1991).

*McCoy v. Tex. Instruments, Inc.*, 183 S.W.3d 548, 555 (Tex. App.—Dallas 2006, no pet.).

Plaintiffs' subjective belief that HCC's evidence is false and its reasons pretexual, sincere as that belief may be, does not create a fact issue to defeat summary judgment. *See e.g.*, *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 576 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("An employee's own subjective belief of discrimination, no matter how genuine, cannot serve as the basis for judicial relief.").

## B. Effective Demotions and Reduced Responsibilities with the CTCE Reorganization in May 2007

Plaintiffs contend that, after Seymour took over as Associate Vice Chancellor, both "Carlton and Reed were placed into positions which constituted demotions." They concede that "[t]heir new job descriptions did contain many of the duties both had already been performing; however, a number of former responsibilities were removed and reassigned." They also concede that their pay was not reduced. Plaintiffs point out, however, that they were both "highly experienced and qualified." "It is a reasonable conclusion supported by all the

facts and evidence," they thus assert, "that the legitimate, non-retaliatory reasons stated by HCC were a pretext for retaliation against Carlton and Reed and an attempt to drive them to quit their jobs and eliminate the threat they, and their potential negative publicity, posed." At the very least, they claim, "Plaintiffs have illustrated significant questions of material fact regarding the motivation of HCC which must be determined by a jury."

In response, HCC argues that plaintiffs' jobs remained substantially unchanged, they received the same pay, and that, as a matter of law, the changes in their positions were not an adverse employment action, as their subjective preference for a particular position does not constitute an actionable demotion. *See McGarry v. Univ. of Miss. Med. Ctr.*, 355 F. Appx. 853, 859 (5th Cir. 2009).

More importantly, HCC asserts, there is no evidence that "any protected activity caused the alleged demotions," as the evidence "proves, and Reed admitted at her deposition, that the wheels of change in CT/CE were in motion *before the harassment complaint was ever filed.*" Nielsen announced the reorganization on December 1, 2006, and described three new leadership positions and explained that reassignment of existing staff would occur after the new Associate Vice Chancellor started. It is undisputed, HCC emphasizes, that the final reorganization in May was designed and implemented by people other than Nielsen, who had already left in February. HCC's summary judgment evidence indicated that the final

34

reorganization took into consideration factors such as workload, efficiency, and compatibility and relatedness of job tasks.

This Court has expressly recognized "[a]gency restructuring is a legitimate, nondiscriminatory reason for an employee's termination." *Henderson v. Univ. of Texas M.D. Anderson Cancer Ctr.*, No. 01-08-00376-CV, 2010 WL 4395416, at *6 (Tex. App.—Houston [1st Dist.] Nov. 4, 2010, pet. denied) (mem. op.) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The evidence demonstrates that Nielsen did not make the decisions about restructuring CTCE that plaintiffs complain about, and they have not articulated why those in charge of restructuring the CTCE department would be incentivized to retaliate against plaintiffs. Assuming that the changes in plaintiffs' job duties amounted to an actionable demotion, plaintiffs have not brought forth evidence that the CTCE restructuring was a pretext for retaliation.

### C. Complaints about Investigation of Sexual Harassment Claims

Plaintiffs next complain about the investigation of their sexual harassment and retaliation claims against Nielsen, asserting it "was managed with repeated attempts to hire, and the eventual hiring of, external investigators with ties or previous history with HCC, its internal counsel, and/or its external counsel." While "Wendy Sicola, Employment Practices Solutions, Inc., concluded her investigation in favor of HCC," plaintiffs note that HCC's general counsel

35

"LeBlanc admitted in his deposition that a former co-worker of his was employed at Employment Practices Solutions and that is why he chose them to conduct the investigation." According to plaintiffs, the "reasonable inference is that the 'investigators' . . . were selected to render a result-oriented investigation, contain Carlton's and Reed's allegations, and whitewash Nielsen and HCC."

In response, HCC contends that, while plaintiffs' complaints about the investigation of their harassment complaints are "potentially relevant to a sexual harassment claim and the employer's duty to take corrective action to prevent future sexual harassment," they do not constitute complaints about an "adverse employment action for purposes of a *retaliation* claim." Moreover, HCC asserts, "the evidence shows that, despite the plaintiffs' refusal to be interviewed as part of the investigation into their claims," the investigator did a commendable job that was "diligent, fair, and non-retaliatory." And plaintiffs' unsupported innuendo about the investigator's alleged bias against plaintiffs notwithstanding, the evidence showed that the investigation was performed by an experienced attorney who knew none of the parties.

To maintain a retaliation claim, the employee must show the employer took action against the employee. TEX. LAB. CODE § 21.055. "An employer's action is an adverse employment action for purposes of a retaliation claim when it is harmful to the point that it could 'dissuade a reasonable worker from making or

supporting a charge of discrimination.'" *Cox v. Waste Mgmt. of Tex., Inc.*, 300 S.W.3d 424, 438 (Tex. App.—Fort Worth 2009, pet. denied) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 68 (2006)). Misguided or ineffective investigations—even those that cause an aggrieved employee additional discomfort or distress—cannot support a retaliation claim absent evidence of a sinister motive on the part of the employer. *Id.* at 438 (employer's forcing employee to attend meeting with alleged harasser, while potentially an imprudent move that the employer concedes could have increased employee's anxiety and intimidated him, was not an adverse employment action for purposes of retaliation claim because the evidence uniformly demonstrated the purpose was to investigate).

We agree that plaintiffs have failed to present any evidence in support of their claim that HCC's investigation (in which they refused to participate) was unfair or biased. In any event, plaintiffs have not articulated how their complaints about that process, even if taken as true, implicate their retaliation claims.

### D. Constructive Discharge

Plaintiffs contend that "[b]eing forced to resign or retire from your position due to a hostile work environment engendered by an employer in retaliation for opposing illegal employment actions, or constructive discharge, is an adverse employment action." They argue that the trial court erred in granting summary

judgment because, the "issue of whether or not the various actions experienced as retaliation by both Reed and Carlton rise to the level of creating a hostile work environment such that a reasonable person would have been forced to quit their job is a disputed material fact question which must be decided by a jury." Plaintiffs point to three specific things as causing their constructive discharge: (1) Oliver's actions towards Reed, (2) Seymour's actions towards both Carlton and Reed, and (3) an incident of vandalism in their office.

The term "constructive discharge" refers to "an employee's reasonable decision to resign because of unendurable working conditions." *Baylor Univ. v. Coley*, 221 S.W.3d 599, 605 (Tex. 2007) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). It is not a separate cause of action but, rather, permits an employee to satisfy the element of "adverse employment action" despite having voluntarily quit. *See Cox*, 300 S.W.3d at 435; *Univ. of Tex. Med. Branch at Galveston v. Hohman*, 6 S.W.3d 767, 772 (Tex. App.—Houston [1st Dist.] 1999, pet. dism'd w.o.j.). "General allegations of mere 'harassment,' without more, are insufficient to raise an issue of material fact as to whether working conditions were so intolerable that a reasonable person would have felt compelled to resign." *Hammond v. Katy Indep. Sch. Dist.*, 821 S.W.2d 174, 178 (Tex. App.—Houston [14th Dist.] 1991, no pet.). We must analyze a constructive discharge claim with

38

reference to a reasonable-person test, not the plaintiff's subjective opinions. *Cox*, 300 S.W.3d at 435.

Plaintiffs argue that Seymour, the new Vice Chancellor of CTCE, was "moved in to help Spangler manage Plaintiffs." "Upon his arrival," plaintiffs claim, "Seymour immediately proceeded to make Carlton's day-to-day existence miserable." Carlton contends that he was "openly cold, hostile and rude." She also argues that she was intimidated by an instance of vandalism in her office during which personal photographs were taken down and one photo was removed.

Carlton's psychologist ultimately wrote a letter to Seymour explaining that Carlton's anxiety levels were dangerously high, she was suffering from symptoms of depression, and she needed some time off. She went on FMLA medical leave on July 20, 2007; when her sick leave time ran out, she retired from HCC on January 1, 2008.

In support of her constructive discharge claim, Reed claims that Oliver made a grunting noise outside her office "in a manner perceived by Reed to be offensive, threatening, and clearly intended to mock her sexual harassment claim against Nielsen." She also contends she was frightened and threatened by her office being vandalized when her trash can was sliced, and she viewed that as a retaliatory action.

39

Finally, Reed complains of an alleged assault by Seymour that precipitated her departure from HCC for medical reasons. On July 7, 2007, Reed sent an email to Seymour informing him that she was going to work from home because she was upset about the vandalism of her office. He responded that she would need to use a sick or vacation day because she had not received advance approval. According to Reed, she "wrote a lengthy email back to Seymour questioning his treatment of her and arbitrary and unequal application of HCC policies to Reed, contrary to established practices at HCC." In that same email, she made what she characterized as a "passing reference to Seymour's wife." According to Reed, the following day "Seymour stormed into Reed's office and began raging at Reed about her mention of his wife in her email to him the previous day."

Reed has a history of transient ischemic attacks, and "was terrified and began experiencing precursor systems." When Seymour left her office, she ran downstairs to campus police, reported the incident, and an ambulance was called and transported her to the hospital. She left the hospital without treatment because experience taught her that lying down quietly at home was the best preventative of an onset of a stroke. Reed's neurologist wrote a letter stating that she could not return to work, and she resigned from HCC for the sake of her health.

HCC argues that, as a matter of law, plaintiffs were not constructively discharged. Alternatively, it argues that plaintiffs have not demonstrated that any

40

constructive discharge was causally related to their engaging in a protected activity as required to support a retaliation claim.

The summary judgment evidence demonstrates that the officer who investigated the alleged vandalism incident in plaintiffs' office tried to discuss the investigation with Carlton, but she declined that request. He spoke to the manger of the office cleaning crews, who reported that the wastecan that Reed claims was sliced was "still functional" but "had been in a state of disrepair for some time and other wastebaskets also were in poor shape." The officer reviewed the access-card logs and video surveillance, which showed nothing out of the ordinary. "Based on the evidence, [he] was unable to conclude that the [waste]basket was intentionally damaged."

In response to Reed's complaint about Oliver's grunting noises, HCC hired two investigators: (1) Gracie Saenz, a former City Councilwoman and former Harris County assistant district attorney, and (2) attorney Franklin Holcomb. They performed a thorough investigation, conducted interviews, and prepared a final report concluding that "the evidence does not substantiate Ms. Reed's allegations."

Plaintiffs do not address the significance of HCC's investigations in response to their vandalism complaints and in response to Reed's complaint about Oliver. HCC's investigation of plaintiffs' complaints, however, undercuts their claim of constructive discharge when properly measured against a reasonable-

41

employee standard. *See Cox*, 300 S.W.3d at 433 (as a matter of law, the conditions of employment should not have compelled resignation given that employer's investigation and action in response to employee's complaint about treatment by supervisor was timely and reasonable); *Tiner v. Tex. Dept. of Transp.*, 294 S.W.3d 390 395 (Tex. App.—Tyler 2009, no pet.) (rejecting claim of constructive discharge because employer timely investigated and acted on employee's complaint about treatment by co-worker). And, as HCC points out in their brief, an allegation of vandalism by an unknown person or coworker does not constitute an adverse employment action. *Gumpert v. ABF Freight Sys. Inc.*, 293 S.W.3d 256, 262 (Tex. App.—Dallas 2009, pet. denied). Finally, we note that there is no evidence that would support plaintiffs' theory that the vandalism and the alleged grunting incidents were tied to their exercise of a protected activity.

We likewise conclude that Seymour's alleged conduct—i.e., being cold and hostile to Carlton and allegedly assaulting Reed—does not create a fact issue on plaintiffs' retaliatory constructive discharge claims. To be sure, there was clearly friction in the CTCE department and clashes between Seymour and plaintiffs. But discrimination laws are not designed to set forth a "general civility code for the American workplace." *White*, 548 U.S. at 68; *Olivarez v. Univ. of Tex. at Austin*, No. 03-05-00781-CV, 2009 WL 1423929, at *3 (Tex. App.—Austin May 21, 2009, no pet.) (mem. op.) (plaintiff must show more than "a rude or uncivil boss"

42

(quoting *Webb v. Cardiothoracic Surgery Assocs. of N. Tex., P.A.*, 139 F.3d 532, 539 (5th Cir. 1998)).  Carlton offers no details of Seymour's treatment of her, and does not articulate how his actions related to her exercise of a protected activity. *Olivarez*, 2009 WL 1423929, at *3 ("Because she provided absolutely no factual allegations of even an approximate date on which those alleged acts occurred, we will not consider the undated allegations in our analysis and will limit our consideration to [plaintiff's] claims for discrete acts of alleged discriminatory conduct.").

Reed does provide details of her July 20, 2007 altercation with Seymour. We agree with HCC, however, that single incident does not raise a fact issue on retaliatory constructive discharge.  Reed's own version of that episode as recounted in her written report to campus police and in her briefing here makes clear that Seymour confronted Reed because he was angry about an email she sent to multiple people that he read as making unflattering insinuations about his personal life.  Thus, even if a single incident such as this one could contribute to a constructive discharge, it cannot create a fact issue on Reed's retaliation claim given that she does not argue that Seymour's reaction was related to her engaging a protected activity.

We overrule plaintiffs' sole issue.

## CONCLUSION

We affirm the trial court's summary judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

44